**CARIBE CARRIERS, LTD., Plaintiff,**

v.

**C.E. HEATH & CO.** (Marine Limited Lloyds' Underwriters (including Turegum Insurance Company and further including certain companies sued herein as Does 1–100 being fictitious names); New Hampshire Insurance Co.; Pohjola Insurance Co.; Companies Through A.W. Knott Becker Scott, Ltd. Including QBE Insurance (International) Limited, Bedford Insurance Company Limited, New Hampshire Insurance Company and Lexington Insurance Company), Defendants.

No. 89 Civ. 1691 (MGC).

United States District Court,
S.D. New York.

Feb. 25, 1992.

Hill, Betts & Nash by Christopher Raleigh, Mary T. Reilly, New York City, for plaintiff.

Mendes & Mount by William J. McAndrews, Brendan J. Malley, New York City, for defendants.

## AMENDED OPINION

CEDARBAUM, District Judge.

Plaintiff Caribe Carriers, Ltd. ("Caribe") sues in admiralty for payment of an insurance claim. Caribe is a Cayman Islands corporation with a place of business in Georgia. Defendants, underwriters of marine hull and machinery insurance policies, are American and foreign corporations. Caribe has moved for summary judgment on its claim. For the reasons discussed below, the motion is granted.

1. Caribe's Rule 3(g) Statement describes the vessel's owner from September 21, 1981 to January 4, 1983 as "Ocean Promoter, Inc." Defendants do not contest that this is the correct name. (Defendants Rule 3(g) Statement ¶ 1.) The Confirmation of Insurance, however, lists the owner

### FACTS

Caribe is the current owner of the M/V "Caribe Hope." On April 21, 1982, the ship ran aground in the port of Providence, Guyana. (Caribe Rule 3(g) Statement ¶ 11.) At that time, it was owned by Ocean Promoter, Inc.[1] and was known as the "Ocean Promoter." (Caribe Rule 3(g) Statement ¶ 2.) The defendant underwriters insured the ship for $2.2 million in the following proportions: 50 percent through C.E. Heath (Marine) Ltd. with Lloyds, Institute of London Underwriters and Turegum Insurance Company, 34 percent through A.W. Knott Becker Scott Ltd. (London) with QBE Insurance (International Limited), Hampshire Insurance Company Limited, and Lexington Insurance Company, 13 percent through American International Marine Agency of New York, Inc. with New Hampshire Insurance Company, and 3 percent with Pohjola Insurance Company. (Caribe Rule 3(g) Statement ¶¶ 6, 7.)

After departing from Guyana, the ship set course for Baltimore, Maryland, laden with cargo. It experienced problems with a main engine and a propeller shaft, and put into port at Port-of-Spain, Trinidad, for temporary repairs. (Miller Aff.Ex. F.) When these repairs were completed, it resumed its voyage to Baltimore. (Caribe Rule 3(g) Statement ¶ 12.) In Baltimore, a diver inspected the vessel. (Caribe Rule 3(g) Statement ¶ 13.) It then proceeded to New York and was drydocked for repairs on June 1, 1982.

The underwriters hired The Salvage Association, Ltd. ("Salvage") to survey the damage attributable to the Guyana grounding while the vessel was in drydock. (Caribe Rule 3(g) Statement ¶ 16.) On September 15, 1982, Salvage issued a report outlining damage to the vessel and indicating that repairs to its starboard propeller and bottom plating would be required in the future but would not be performed in New York. (Miller Aff.Ex. I (Salvage's Re-

of the Ocean Promoter as "Promoter Columbia, Inc." (Miller Aff.Ex. A.) Despite the discrepancy, the Ocean Promoter's owner is referred to herein as "Ocean Promoter, Inc." in accordance with the parties' terminology.

port).) The report states that partial repairs had rendered the vessel seaworthy but that: "Notification is to be given to the interests concerned as to when and where the permanent repairs are to be carried out in order that further survey may be held, the completed repairs inspected and a price agreed." (Miller Aff.Ex. I at 7.)

The ship left drydock on July 23, 1982. (Miller Aff. Ex. F) At that time, Greycas, Inc. ("Greycas"), the ship's mortgagee, was loss payee under the insurance policies. The Confirmation of Insurance (the "confirmation"), issued on November 20, 1981, had named as loss payees both Ocean Promoter, Inc. and Greyhound Leasing and Financial Corporation ("GLFC"), of which Greycas was a subsidiary. (Caribe Rule 3(g) Statement ¶ 8.) On February 10, 1982, Rollins Burdick Hunter of New York, Inc. ("RBH"), the insurance broker which had placed the policies, issued Endorsement No. 1 to the confirmation by which the insurance and all benefits as loss payee were assigned to Greycas.[2] (Miller Aff. ¶ 7.)

In late 1982, Ocean Promoter, Inc. defaulted on its mortgage to Greycas. (Caribe Rule 3(g) Statement ¶ 26.) Greycas purchased the ship by judicial sale on January 4, 1983 and renamed it the "Yvonne C." (Miller Aff. ¶ 28 and Ex. B.)

On March 30, 1983, RBH issued a Statement of General and Particular Average (the "statement") assessing the underwriters for the New York repairs. (Caribe Rule 3(g) Statement ¶ 20.) The statement also reported that

> [p]ermanent repairs to damaged bottom plating and internals and renewal of the starboard propeller were deferred and, accordingly, a further claim will be presented when these repairs have been completed. In this regard we are advised by the Owner's Surveyor that the costs are estimated to be approximately $8,000. [sic] for the propeller and $177,-000. [sic] for bottom repairs, exclusive of drydocking costs.

(Miller Aff.Ex. F (the Statement) at 3.) Each underwriter, except Bedford Insurance Company, received the statement, approved it, and paid the assessed amount for repairs that had been completed. (Caribe Rule 3(g) Statement ¶ 24.) Bedford Insurance Company did not pay its 8 percent share because it had become insolvent. *Id.* Greycas, the loss payee, directed RBH to distribute the insurance payments directly to the contractors that had repaired the ship. (Caribe Rule 3(g) Statement ¶ 25.)

As owner of the "Yvonne C," Greycas gave a first preferred mortgage on the vessel to Greyship Corporation ("Greyship"), also a wholly owned subsidiary of GLFC. (Inman Aff. ¶ 6.) On April 8, 1985, Greycas transferred the Yvonne C to Greyship by judicial sale. (Inman Aff.Ex. C.) The bill of sale recites that Greycas received $36,000 consideration but does not show whether Greycas transferred its rights as loss payee on the insurance policies to Greyship. *Id.*

GLFC, now known as "Greyhound Financial Corporation" ("GFC") and acting as agent for Greyship, retained a broker to sell the Yvonne C along with two other ships owned by its subsidiaries. (Inman Aff. ¶ 31.) On May 31, 1985, Greyship sold the Yvonne C to plaintiff. (Caribe Rule 3(g) Statement ¶ 34.) The Memorandum of Agreement between Greyship and Caribe (the "MOA") provided that "Seller shall assign to Buyer any and all claims for unrepaired hull and machinery damage(s), if any, whether previously reported or otherwise...." (Caribe Rule 3(g) Statement ¶ 35.) The MOA is governed by New York law. (Inman Aff.Ex. E (Memorandum of Agreement) at 7.)

Shortly after the purchase, plaintiff renamed the vessel the "Caribe Hope" and, in July 1985, drydocked it in Port Arthur, Texas to complete repairs of the damage sustained in the Guyana grounding. (Caribe Rule 3(g) Statement ¶ 36.) Caribe informed the underwriters of the drydocking, and the underwriters again hired Salvage

---

**2.** Paragraph 9 of Caribe's Rule 3(g) Statement states that RBH issued the endorsement in 1981, while paragraph 25 of the same statement states that RBH issued the endorsement in 1982. The endorsement itself is dated February 10, 1982. (Miller Aff.Ex. A.)

to survey the repairs. (Caribe Rule 3(g) Statement ¶ 38.) Salvage approved the repair cost of the propeller and bottom plating damage. (Caribe Rule 3(g) Statement ¶ 39.)

Caribe contacted RBH to claim insurance payments for these repairs. (Caribe Rule 3(g) Statement ¶ 37.) RBH, in turn, contacted GFC to confirm that the insurance claim had been assigned to Caribe. (Miller Aff. ¶ 37.) Deborah Inman, supervisor of insurance for GLFC and GFC throughout the period, informed RBH by letter of October 28, 1985 that both Greycas and Greyship are wholly owned subsidiaries of GFC:

> When Greyship sold the Ocean Promoter to Caribe Carriers, Ltd. it was with the understanding that Greyship assigned it's [sic] interest in pending insurance claims. This assignment is acceptable to Greycas and we will release our interest as Loss Payee on the above referenced claim.

(Inman Aff.Ex. A. (Letter to RBH).)

In July 1986, RBH sent a supplementary statement of particular average to the underwriters, assessing them $132,510.35 for the remaining claims arising from the Guyana grounding. (Miller Aff. ¶ 35.) Because the actual repair cost of the bottom plating exceeded the estimated resulting diminution in the ship's value, the assessment consisted of the sum of the actual propeller repair cost and the estimated diminution in value from the bottom plating damage. (Miller Aff. ¶ 33.)

The underwriters requested more information from RBH concerning the sale of the vessel and assignment of the claims. (Miller Aff. ¶ 38.) On June 9, 1987, RBH sent documentation of the vessel's sale and Inman's letter confirming the claim assignment to defendant C.E. Heath, the lead underwriter. (Miller Aff. ¶ 39.) C.E. Heath refused to recognize the assignment from Greycas to Greyship and declined to pay the claim. (Caribe Rule 3(g) Statement ¶ 54.) Each of the remaining underwriters also refused to pay. After Caribe filed this action, however, Pohjola Insurance Company authorized payment of its share of the claim. (Miller Aff. ¶ 42.) Plaintiff moves for summary judgment against the remaining defendants.

## DISCUSSION

A motion for summary judgment will be granted under Federal Rule of Civil Procedure 56 if the court determines that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). In assessing the record, all ambiguities and inferences to be drawn from the underlying facts are to be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial are to be resolved against the moving party. *Id.; see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). If the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party, then there is a genuine factual dispute and summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Defendants oppose summary judgment on the grounds that: 1) New York law prohibits third-party direct actions on insurance claims; 2) service of process was insufficient; 3) there is a genuine issue of material fact as to whether Greycas assigned the insurance claim to Greyship; and, 4) Caribe's claim was relinquished by an agreement between GFC and the defendants.

*The New York Direct Action Statute*

Defendants argue that New York law is applicable to this case and assert that section 3420 of the New York Insurance Law prohibits direct action by Caribe on a marine insurance policy. Defendants note that federal admiralty law neither authorizes nor forecloses a third party's right to sue an insurance company directly and, citing *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), urge that the law of New York should be applied on this issue. Even assuming, as the parties do, that New York law is an appropriate

source for the answer to this admiralty question, *cf. State Trading Corp. v. Assuranceforeningen Skuld,* 921 F.2d 409, 414–416 (2d Cir.1990), the New York direct action statute does not prohibit this suit by an assignee of an insurance claim.

New York Insurance Law § 3420 permits injured judgment creditors of an insured to bring a direct action against the insured's liability insurer. It states that "any person who ... has obtained a judgment against the insured ... for damages for injury sustained" may bring an action "against the insurer upon any policy or contract of liability insurance ... to recover the amount of a judgment against the insured." N.Y.Ins.Law § 3420(b). The section applies to policies insuring against "liability for injury to person" or "liability for injury to, or destruction of, property," N.Y.Ins.Law § 3420(a), but it expressly exempts marine insurers, N.Y.Ins.Law §§ 2117(b)(3), 3420(i).

Defendants reason that the legislature's exemption of marine insurers from a statute that permits direct action against other insurers demonstrates the legislature's "clear and conscious choice ... that marine insurers not be subject to a direct action by strangers to the insurance contract." (Def.'s Mem. at 6.) Defendants cite several cases which adopt this reasoning with respect to marine liability insurers. For example, New York law precludes direct action by cargo shippers against the liability insurers of a charterer who loses the shippers' goods. *WABCO Trade Co. v. S.S. Inger Skou,* 663 F.2d 369 (2d Cir.1981). Similarly, merchant seamen injured on a vessel cannot bring a direct action against the insolvent vessel owner's liability insurer. *Miller v. American S.S. Owners Mut. Protection and Indem. Co.,* 509 F.Supp. 1047 (S.D.N.Y.1981); *Ahmed v. American S.S. Owners Mut. Protection & Indem. Ass'n, Inc.,* 444 F.Supp. 569 (N.D.Cal.1978), *aff'd in part and remanded in part,* 640 F.2d 993 (9th Cir.1981) (decided under New York law). And, the widow of a tugboat operator who drowned when the vessel sank cannot bring an action directly against the tugboat owner's liability insurer. *Cowan v. Continental Ins. Co.,* 86 A.D.2d 646, 446 N.Y.S.2d 412 (2d Dep't 1982).

Defendants do not show, however, that New York's exemption of marine liability insurers from direct actions by judgment creditors of their insureds applies outside the limited context specified by the statute. Defendants' cases establish that section 3420, entitled "liability insurance ... right of injured person," prevents a third party's recovery from a marine liability insurer, not a claim assignee's recovery from a marine property insurer. Caribe does not claim that it was injured by a party for whom the defendants provided liability insurance. Instead, plaintiff, as assignee of an insurance claim and owner of the insured property, seeks to recover from the vessel's property insurers. Section 3420 does not bar this type of action.

Recognizing that the cases they cite primarily address the status of judgment creditors against liability insurers, defendants maintain that New York law generally precludes a plaintiff's recovery as a third-party beneficiary of an insurance policy. Defendants rely upon *Tillman v. Fireman's Fund Ins. Co.,* 590 F.Supp. 246 (S.D.N.Y.1984), for the proposition that only the insured has a cause of action against an insurer unless a statute or the insurance policy itself provides otherwise.

The plaintiff in *Tillman* owned a valuable collection of pottery and china which was lost while stored in a warehouse. The defendant was the warehouse's liability insurer. The collection's owner claimed that it was a third-party beneficiary of the insurance policy. The policy expressly stated that the "coverage provided ... is intended only for the protection of the [insured] and no action or proceeding based on the provisions hereof shall be brought in the name or for the benefit of the [insured's] [c]ustomers...." *Tillman,* 590 F.Supp. at 248. The court held that "*liability* coverage of the sort provided by the [warehouse's] policy is granted to the insured only...." *Id.* at 249 (emphasis added).

*Tillman,* like the other cases defendants cite, applies only to third-party actions on

liability insurance, whether the third party claims status as a judgment creditor or as a beneficiary. The current action does not involve liability insurance and Caribe does not claim status as either a judgment creditor or a third-party beneficiary. Thus, defendants do not point to any New York authority which precludes Caribe from directly suing these defendants.

*Service of Process*

■ Defendants contend that plaintiff's service of process was defective because plaintiff did not serve defendants personally.

The insurance policies' service of suit clauses provide that service may be made upon Mendes & Mount, the law firm which represents the underwriters in the current action. Defendants argue that because plaintiff was not the insured under the policies, plaintiff could not invoke this clause and serve defendants by "simply mail[ing] the summons and complaint to Mendes & Mount." (Def.'s Mem. at 10.) In fact, plaintiff personally served the summons and complaint on defendants' counsel. (Tomeo Aff. (Affidavit of Service).)

Plaintiff urges that defendants have waived this defense. The defense of insufficient service of process is waived if not asserted in a motion filed before any responsive pleading or in a defendant's answer. Fed.R.Civ.P. 12(h); *Santos v. State Farm Fire & Casualty Co.*, 902 F.2d 1092, 1096 (2d Cir.1990) (defendant's attorneys "made no attempt to communicate to [plaintiff] that they were not authorized to accept process").

Defendants' answer to the amended complaint alleges as a sixth affirmative defense that:

[t]here is no right of direct action against marine insurance underwriters by third-parties in the State of New York. Accordingly, plaintiff's purported service of process on defendants c/o Mendes & Mount and/or the Deputy Superintendent of Insurance is improper, insufficient, and null and void.

By reason of the premises, defendants are not liable for any of the damages alleged and the Amended Complaint should be dismissed.

(Answer to Amended Complaint ¶¶ 32–33.) Thus, defendants' answer to the amended complaint raised the defense of insufficient service of process only in the context of defendants' argument concerning the New York direct action statute and not as a general defense. Similarly, defendants now contend that "[a]s plaintiff is precluded from a direct action against defendant [u]nderwriters, plaintiff's purported service of process upon defendant [u]nderwriters through Mendes & Mount is improper and insufficient under the circumstances." (Def.'s Mem. at 8.)

This argument is based on an incorrect premise. As discussed above, the New York direct action statute does not bar plaintiff's action as assignee of a claim under insurance policies.

Even if defendants' answer to the amended complaint were construed to raise a general defense of insufficient service of process, defendants' conduct since filing the answer to the amended complaint prevents them from now asserting the alleged defect in service as a barrier to summary judgment for plaintiff. One responsive pleading "do[es] not preserve the defense [of insufficient service of process] in perpetuity." *Burton v. Northern Dutchess Hospital*, 106 F.R.D. 477 (S.D.N.Y.1985). If defendants believed that service of process was not proper and intended to raise the defense outside the context of their argument concerning the direct action statute, they should have moved "at the earliest possible opportunity to dismiss the complaint." *Benveniste v. Eisenman*, 119 F.R.D. 628 (S.D.N.Y.1988). Instead, defendants waited almost two years after filing their answer to the amended complaint before finally asserting insufficient service of process in response to the current motion.

In *Datskow v. Teledyne, Inc.*, 899 F.2d 1298, 1303 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 149, 112 L.Ed.2d 116 (1990), the Second Circuit barred a defendant from "complaining about the defective form of service" where the defendant unambiguously alleged improper service in its an-

swer, attended a conference with a magistrate, participated in scheduling discovery and motion practice, and moved to dismiss for insufficient service of process five months after the complaint had been filed. After plaintiff served Mendes & Mount, defendants filed an answer in which improper service was ambiguously alleged in the context of an affirmative defense concerning the New York direct action statute. During the more than two years since the action was filed, defendants have not moved to dismiss. Furthermore, defendants have appeared at pretrial conferences and completed pretrial discovery without pursuing the issue of defective service of process.

In any event, defendants cite no authority in support of their argument that an assignee of an insurance claim cannot effect service of process in conformity with the terms of the policy on which the claim is based. It is the usual rule that ambiguity in the meaning of a clause in an insurance policy is to be construed against the insurer. *See Westchester Resco Co. v. New England Reinsurance Group,* 818 F.2d 2, 3 (2d Cir.1987); *Allen Spooner & Son, Inc. v. Connecticut Fire Ins. Co.,* 314 F.2d 753, 755 (2d Cir.1963).

For all of these reasons, defendants' belated assertion of insufficient service of process does not defeat plaintiff's motion for summary judgment.

*The Assignment from Greycas to Greyship*

██ Caribe's insurance claim rests upon the transfer of that claim from GLFC and Ocean Promoter, Inc. to Greycas, from Greycas to Greyship, and from Greyship to Caribe. It is undisputed that the ship itself was transferred from Ocean Promoter, Inc. to Greycas, from Greycas to Greyship, and from Greyship to Caribe. It is also undisputed that GLFC and Ocean Promoter, Inc. assigned the insurance and rights as loss payee to Greycas before the Guyana grounding and that Greyship assigned any rights it had to Caribe when it sold the ship. Defendants challenge only one link in the chain—the assignment of the insurance claim from Greycas to Greyship.

Greycas transferred the vessel to Greyship by judicial sale. No written agreement to assign the insurance claim for repairs to the vessel accompanied that sale. Defendants point out that marine insurance policies are not incidents of ownership and do not pass automatically with the sale of the insured property. Michael J. Mustill & Jonathan C.B. Gilman, *Arnould's Law of Marine Insurance and Average* § 252 (16th ed. 1981). Defendants argue that the policy was not assigned with the transfer of the vessel from Greycas to Greyship and could not be assigned thereafter.

The treatise cited by defendants relies upon the British Marine Insurance Act of 1906, which codified British marine insurance law. Section 51 of that act states that

[w]here the assured has parted with or lost his interest in the subject-matter insured, and has not, before or at the time of so doing, expressly or impliedly agreed to assign the policy, any subsequent assignment of the policy is inoperative:

Provided that nothing in this section affects the assignment of a policy after loss.

Marine Insurance Act of 1906, 6 Edw. 7, Ch. 41 § 51. The assignment at issue in the present case occurred after the loss. Thus, even if Greycas did not "expressly" or "impliedly" assign the claim when the vessel was transferred, the source that defendants cite does not support defendants' contention that there could be no assignment.

Although the insurance policies were not assigned automatically as incidents of ownership with the sale of the vessel, there is no genuine issue of material fact that Greycas did assign its insurance claim to Caribe through Greyship. The affidavit of Deborah Inman, supervisor of insurance of GFC at the time of the vessel's sale and currently an assistant vice-president of GFC, describes the relationship between Greycas and Greyship as follows: Greycas and Greyship are both wholly owned subsidiaries of GFC. (Inman Aff. ¶ 1.) Neither has any employees. (Inman Aff. ¶ 2.) The insurance department of GFC is respon-

sible for all matters relating to insurance for both subsidiaries. *Id.* Counsel for Greycas and GFC represented Greyship in the sale to Caribe. (Inman Aff. ¶ 9.) While Greycas was not a party to the sale from Greyship to Caribe, Greycas was aware of the insurance claim assignment and assented to it. (Inman Aff. ¶¶ 9, 10.) It was Greycas' understanding at the time of the sale from Greyship to Caribe that Greycas and Greyship assigned any insurance claims for unrepaired damage to Caribe. (Inman Aff. ¶ 10.) This remains Greycas' understanding. (Inman Aff. ¶ 13.)

Inman's letter of October 28, 1985 to RBH provided confirmation to the underwriters that Greycas had assigned any insurance claims to Caribe through Greyship. The letter is written on Greycas stationery and signed on behalf of Greycas. (Inman Aff.Ex. A.) It was forwarded to the underwriters by RBH on June 9, 1987. ·

Defendants assert that there is an issue of material fact with respect to the nature of Inman's employment with GFC and her authority to act on behalf of Greycas. (Defendants' Rule 3(g) Counterstatement ¶ 8.) Plaintiffs, however, have made a sufficient showing that Inman has authority to make statements on behalf of Greycas. Plaintiffs' affidavits and exhibits establish that Inman represented Greycas when the underwriters originally issued the policies, when Greycas sold the ship to Greyship, and when Greycas confirmed the assignment of the insurance claim to Caribe. In fact, Deborah Inman is listed on the November 20, 1981 Confirmation of Insurance. (Miller Aff.Ex. A.) Defendants offer nothing which suggests that Inman does not have the authority she claims. Therefore, there is no genuine issue of material fact as to this matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ No particular words or phrases are necessary to effect an assignment. *Antria Shipping Co. v. Triton Int'l Carriers,* 1980 AMC 678 (S.D.N.Y.1976). A valid assignment merely requires a completed transfer of the entire interest of the assignor that divests the assignor of all control

over the right assigned. *Id.* Greycas' expressed intent to assign the insurance claim, its ratification by letter to Caribe that it had relinquished the claim, and its provision of notice of the assignment to the underwriters establish that Greycas transferred its entire interest in the claim to Caribe. *See Reliable Marine Boiler Repair, Inc. v. Mastan Co.,* 325 F.Supp. 58, 62 (S.D.N.Y.1971) (the reasonable expectation of an assignment and its subsequent ratification create a valid and enforceable assignment). Thus, Caribe possesses a valid assignment of the insurance claim for damage sustained during the ship's Guyana grounding.

*The Settlement, Release and Indemnity Agreement*

■ Defendants argue that even if Caribe received a valid assignment of the insurance claim, a subsequent agreement between defendants and both Greycas and GFC released the underwriters from any liability. On May 5, 1989, Greycas and GFC executed a "Settlement, Release, and Indemnity Agreement" (the "agreement") which purports to release the defendants from any claims related to ships in GFC's "fleet." (Flanagan Aff.Ex. A.) The agreement mistakenly defines GFC's fleet to include the "Ocean Promoter" (the Caribe Hope's original name). (Flanagan Aff.Ex. A (the agreement) at 3.)

Caribe points out that defendants raise this agreement for the first time in opposition to summary judgment. Caribe contends that defendants' failure to assert release as an affirmative defense in their answer constitutes waiver of the defense. Caribe also argues that the agreement only purports to release the defendants from liability for casualties to four vessels which were the subject of the two lawsuits that the agreement settled. Plaintiff quotes a section of the agreement that refers to four vessels other than the one that is the subject of this action. (Pl.'s Reply Mem. at 14.) Caribe, however, omits the phrase that precedes the quoted language which makes clear that the four named vessels

are among those included in the release of any claims relating to the entire "fleet."

In any event, the agreement cannot release defendants from liability to this plaintiff. Defendants cite *Nissho–Iwai Co. v. M/T Stolt Lion,* 1986 A.M.C. 269, 1984 WL 365 (S.D.N.Y.1984), for the unexceptionable proposition that an assignee of a cause of action takes all the rights of its assignor. But, *Stolt Lion* does not support defendants' contention that an agreement between an assignor and obligor can release the obligor from liability to the assignee. In *Stolt Lion,* the court rejected an obligor's argument that an assignee's recovery of marine insurance claim is limited to the amount that the assignee paid the assignor for the claim. Citing both state and federal law, the court refused to create a special admiralty rule governing assignments and permitted the assignee full recovery of the assigned claim.

Here, as in the case defendants cite, the underwriters offer no reason for a departure, in admiralty, from the traditional rule that an assignee who has given notice of the assignment may not be prejudiced by any new dealings between the original parties. *Welch v. Mandeville,* 1 Wheat. (14 U.S.) 233, 4 L.Ed. 79 (1816). Defendants do not contest that in June of 1987 they received notice that the insurance claims had been assigned to Caribe. Thus, defendants had actual notice from both the assignee and the assignor that any subsequent payments to GFC or Greycas would not release them from liability to Caribe. Therefore, the 1989 agreement does not release the underwriters from liability to Caribe for claims arising from the Guyana grounding.

### CONCLUSION

For the reasons discussed above, Caribe's motion for summary judgment is granted. Caribe shall settle judgment on two days notice.

SO ORDERED.